UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | |
|---|---|
| Richard C. Hickson,            ) | |
|                  ) | |
|            Plaintiff,      ) | |
|                  ) | |
|                  ) | DOCKET NO. _____ |
| David Bowler, both in his official and    ) | |
| individual capacities, Vescom Corporation, ) | |
| and Domtar Industries, Inc.       ) | |
|                  ) | |
|            Defendants.      ) | |
|                  ) | |

**COMPLAINT; DEMAND FOR JURY TRIAL;
AND REQUEST FOR INJUNCTIVE RELIEF**

Plaintiff complains against the Defendants as follows:

**SUMMARY OF THE ACTION**

1.     This is a civil rights action brought by a private security officer, Richard

C. Hickson, who was fired the same day he wrote a whistleblowing email to the

Governor of Maine.  Mr. Hickson worked for Defendant Vescom Corporation

("Vescom") as a security officer at the Woodland Pulp and Paper Mill in Baileyville,

Maine, ("the mill") owned by Defendant Domtar Industries ("Domtar"). After nearly

five years of employment with Vescom, Mr. Hickson had a good employment record

with no disciplinary warnings. On the morning of July 25, 2006 he sent from his home

an email, explicitly in his personal capacity, to the Governor reporting unsafe and

unlawful conditions and practices concerning the Governor's recent visit to the mill.

Just hours later, Mr. Hickson's employment was terminated in retaliation for sending

the e-mail to the Governor. Defendant David Bowler, the then-head of security for the

Governor, repeatedly contacted Domtar to complain about the email with a series of communications highly critical of Mr. Hickson's fitness as an employee and security officer and calculated to result in the termination of his employment.  Domtar predictably responded to these pressuring communications from the Office of the Governor by intimidating Vescom to fire Mr. Hickson. When Mr. Hickson arrived for work at the Vescom office that afternoon, his supervisor handed him a copy of his email to the Governor and informed him that his employment was being terminated. As a result of Defendants' unlawful whistleblower and free speech retaliation, willful and reckless disregard for Mr. Hickson's civil rights, and tortious interference with Mr. Hickson's contractual relations and prospective economic advantage, he is seeking the full available remedies including declaratory relief, injunctive relief and reinstatement, back pay and benefits, compensatory damages, punitive damages, and reasonable attorney's fees and expenses.

## PARTIES

2.     Richard Hickson is a citizen of the United States and a resident of Eastport, Maine.

3.     Defendant Vescom Corporation is a corporation incorporated in Illinois. During 2005 and 2006, Vescom employed in excess of 500 employees during 20 or more weeks of each of those years. It is engaged in an industry affecting interstate commerce.

4.     Defendant Domtar Industries Inc. is a corporation incorporated in Delaware. During 2005 and 2006, Domtar employed in excess of 500 employees during 20 or more weeks of each of those years. It is engaged in an industry affecting interstate

2

commerce.

5.     Defendant David Bowler is a Lieutenant in the Maine State Police and the commander of the Maine State Police Special Investigations Unit. During the time period at issue in this case, July of 2006, David Bowler was a Sergeant in the Maine State Police and responsible for providing security to the Governor of the State of Maine. He is being sued in both his official and individual capacities.

## JURY TRIAL DEMAND

6.     Under Fed. R. Civ. P. 38(b), Plaintiff hereby demands trial by jury on all issues triable to a jury.

## JURISDICTION AND VENUE

7.     This action arises, in part, under the First and Fourteenth Amendments to the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. § 1983. This court has proper subject matter jurisdiction under 28 U.S.C. §§ 1341 and 1343. Under 28 U.S.C. § 1367(a), this Court has supplemental jurisdiction over the Plaintiff's state law claims because they are so related to the federal claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

8.     Venue is proper in the District of Maine under 28 U.S.C. § 1391(b). Under Local Rule 3(b), this action is properly filed in Bangor because this case arises in Washington County.

## FACTUAL ALLEGATIONS

9.     Richard Hickson worked as a security officer for Hall Security at

Domtar's Woodland Pulp and Paper Mill in Baileyville, Maine ("the mill") from 1995 through 1999. Mr. Hickson's position with Hall Security included supervisory and training responsibilities.

10.    In 2001, Mr. Hickson was hired by Vescom to work as a safety officer at the mill.

11.    Vescom placed Mr. Hickson in a supervisory position and asked him to perform training functions and draft written training materials.

12.    On Saturday, July 8, 2006, the Governor of Maine, along with State Representative Anne Perry, Maine State Police Sergeant Scott Ireland, a male aid, and the Governor's personal security guard, David Bowler, toured the mill.

13.    Mr. Hickson was on duty at the mill's front gate guardhouse during the Governor's tour of the mill.

14.    The security officers at the front gate guardhouse were not given a list of the identities of the persons entering the mill for the July 8, 2006 tour by the Governor and his group or given information about the planned tour route.

15.    Mr. Hickson reasonably and in good faith believed that it was a federal legal requirement under OSHA that all visitors to the mill sign in with security because he was taught during his training as a security officer at the mill that the sign-in was an OSHA requirement.

16.    Mr. Hickson believed it was unsafe for visitors to enter the mill without signing in because in the event an emergency occurred at the mill, the sign-in list would be relied upon by emergency responders to determine who was in the mill and where they were within the mill. Without an accurate sign-in list, emergency responders might

call off a rescue operation while victims were still in the building or emergency responders themselves might be injured while searching for persons who were not in the building or who were in a different part of the building.

17.   After the Governor and his group of visitors passed below the guardhouse and were about to enter the mill, Mr. Hickson observed that they did not have safety footwear and that he could not see emergency respirators on their persons.

18.   At this time, Mr. Hickson observed that a woman travelling with the group, later identified as Representative Perry, was wearing open-toed sandals with exposed skin. He also observed that several other members of the tour group were wearing dress shoes rather than safety footwear.

19.   By the time Mr. Hickson could see that the visitors were not wearing safety footwear and realized that he could not see respirators on their persons, the visitors were over fifty feet away and down a flight of concrete stairs.

20.   Mr. Hickson believed that it was unsafe to wear open-toed sandals in the mill because there was a large amount of corrosive material in the mill, including corrosive chemicals that looked like water but that would severely burn skin on contact.

21.   Mr. Hickson had been trained that it was unsafe to enter the mill without protective footwear and that it was Domtar policy and a safety requirement that anyone entering the mill wear footwear and pants that did not leave exposed skin.

22.   As the visitors exited the mill, Mr. Hickson observed that he could still not see emergency escape respirators on their persons. Since he had seen both sides of the visitors as they entered and exited the mill, and because the emergency escape respirators would be worn hanging visibly from the waist, Mr. Hickson reasonably

5

concluded that they did not have emergency escape respirators on their persons.

23.  Mr. Hickson believed it was unsafe to tour the mill without an emergency escape respirator because the mill contained chemical tanks that could release extremely poisonous gasses if they malfunctioned.

24.  Mr. Hickson had been trained that in the event of such a malfunction there would be no safe place in the mill building or immediate vicinity. Mr. Hickson had been trained that such a malfunction would likely prove fatal very quickly to anyone in the mill building or immediate vicinity who did not have an emergency escape respirator on their person. Mr. Hickson was trained that it was Domtar policy and a safety requirement that anyone touring the mill carry an emergency escape respirator on their person.

25.  More than an hour passed from the time Mr. Hickson observed the July 8 visitors enter the mill until Mr. Hickson saw them exit the mill.

26.  Based on his training and experience working as a safety officer at the mill, Mr. Hickson believed that OSHA regulations had been violated and the safety of the Governor, the other visitors to the mill, and emergency responders was jeopardized because the July 8 visitors had not worn proper protective footwear, had not carried emergency escape respirators during their tour, and had not been signed in at the front gate guardhouse.

27.  On July 8, 2006, Mr. Hickson reported to Vescom his concerns about the improper safety procedures that had been followed by the Governor's group in the Vescom logbook for the mill: "1336 Governor and group in mill –safety concern-no sign in by anyone-improper footwear. 1445 Governor exited the mill."

28.     After the Governor's tour, Mr. Hickson spoke with Darren Ireland. Darren Ireland is a Domtar employee and the brother of Scot Ireland, one of the security officials who had accompanied the Governor on the July 8 tour.

29.     Darren Ireland told Mr. Hickson that on July 8 he met his brother and the Governor's tour group at the Number 3 recovery boiler.

30.     The Number 3 recovery boiler is at the heart of the mill, and Mr. Hickson believed that the Number 3 recovery boiler was not a safe place to tour without signing in at the guardhouse, wearing safety footwear, and carrying an emergency respirator. He believed this because he had been trained that these precautions were necessary when touring the mill, especially in the area of the mill where the Number 3 recovery boiler was located.

31.     On Monday, July 10, 2006, Mr. Hickson's supervisor David Norman returned to work after having taken the weekend off. He read Mr. Hickson's entry in the logbook about his safety concerns regarding the Governor's visit before Mr. Hickson arrived for his shift.

32.     When Mr. Hickson arrived for his shift on July 10, 2006, he immediately approached Mr. Norman to report the problems he had observed with the safety procedures during the governor's visit. Mr. Hickson explained the safety problems he had witnessed to Mr. Norman.

33.     Mr. Norman took no action to address Mr. Hickson's concerns or to prevent the safety problems Mr. Hickson had reported from being repeated in the future.

34.     Mr. Norman did not tell Mr. Hickson that his safety concerns about the

7

July 8 tour were unfounded or that it was not an OSHA requirement that visitors sign in with security. Mr. Norman did not direct Mr. Hickson's attention to any policy or operating procedure to allay his concerns about the tour by the Governor and the other visitors in the Governor's group.

35.    Mr. Norman did not tell Mr. Hickson that the Governor's tour group had followed a safe route through the mill or that the group did not go to the "number 3 recovery boiler."

36.    On July 14, 2006 Scott Beale entered the guardhouse to get a key while Mr. Hickson and Mr. Norman were both present. Mr. Beale was a Domtar official in charge of safety at the mill and was one of several Domtar officials who had accompanied the Governor's group during the July 8, 2006 tour.

37.    When Mr. Beale entered the guardhouse on July 14, 2006, Mr. Hickson reported to him the safety concerns he had about the July 8 tour.

38.    In response to Mr. Hickson's expressed concerns, Mr. Beale explained that Domtar officials had "tried to herd" the visitors and had "tried to watch them" during the tour. Mr. Beale said, "Well at least someone was paying attention."

39.    Mr. Beale never told Mr. Hickson that proper safety procedure had been followed during the July 8 visit, that the tour had followed a safe route, or that the group did not go to the "number three recovery boiler."

40.    After Mr. Hickson's conversation with Mr. Beale in the presence of Mr. Norman, Mr. Norman teased Mr. Hickson about his safety concerns by asking, "Did you get the Governor straightened out yet?"  Mr. Hickson replied, "Not yet." This was Mr. Norman's only contribution to the conversation.

41.    Mr. Norman never told Mr. Hickson that he should not have spoken with Mr. Beale about his safety concerns. Mr. Norman never told Mr. Hickson that he should not speak to Domtar representatives about safety concerns. Mr. Hickson was never warned or reprimanded by any Vescom official for speaking with Mr. Beale about his safety concerns.

42.    After Mr. Hickson had reported his concerns to both Mr. Norman and Mr. Beale, no action was taken by either Vescom or Domtar to address Mr. Hickson's concerns or to prevent the safety problems Mr. Hickson reported from being repeated in the future.

43.    No Vescom or Domtar official told Mr. Hickson that the July 8 tour had been conducted safely, that proper procedure had been followed, or that OSHA requirements had been fulfilled.

44.    On the morning of July 25, 2006, Mr. Hickson visited the official Internet website of the State of Maine on his personal home computer while he was at his home and off duty from work.

45.    Mr. Hickson clicked on a photograph of the Governor of Maine and was taken to the Governor's home page. He then clicked on a link that said, 'Contact Me.' He was taken to a page that read, "I want to hear from you. Whether you have an issue involving state government, want to share your thoughts, or offer feedback on this site, please take the time to use one of the following methods to contact me."

46.    Mr. Hickson was still very concerned about the safety problems with the July 8, 2006 tour of the mill. Although he had reported his concerns to his supervisor, no action had been taken to prevent similar safety issues from repeating themselves. He

9

was concerned that the Governor might tour the mill or another similar mill again in the future and that the Governor's safety or that of others might be endangered again and that OSHA regulations would be violated. He was also concerned that other visitors to the mill might have their safety endangered in the future.

47.    Because of his concerns about safety hazards and OSHA violations, and because his employer had taken no action to correct the problem or allay his concerns after he reported his concerns to his supervisor, Mr. Hickson wrote an email to the Governor reporting his safety concerns in response to the invitation on the Governor's website.

48.    Mr. Hickson sent his email whistleblowing report at 10:35 a.m. on July 25, 2006.

49.    In his email to the Governor, Mr. Hickson outlined his concerns about the July 8, 2006 tour of the mill. Mr. Hickson wrote in part:

> None of your entourage signed the entry log at the Main Gate and your group wore inadequate safety gear. The entry log is not just a requirement of Domtar but, is also an OSHA requirement. In case of an emergency the entry logs are the only way of determining who may be in the mill and in what area to search. As far as safety equipment your dress shoes were not protection enough against the corrosive elements in the mill. The woman in your group was wearing open toe shoes with bare skin showing and your protective detail wore dress shoes that were not safety shoes. I didn't notice any respirators on your group either. . . .I am rather tough on safety and this is just a reminder for you in case you should happen to tour the mill on another occasion.

50.    Mr. Hickson explicitly stated in his email that he was writing in his personal capacity and not as an employee of Vescom: "Please note that this is coming from my personal email. . . . [T]he email to you was a decision on my part alone

therefore no one else should be held accountable for what I had to say."

51.   Mr. Hickson never received a response from the Office of the Governor.

52.   At 10:40 a.m. on July 25, 2006, a staffer at the Office of the Governor forwarded Mr. Hickson's email to then Sgt. David Bowler of the Maine State Police.

53.   Mr. Bowler was delegated final authority for handling Mr. Hickson's report by the Office of the Governor.

54.   Instead of investigating the validity of the report, ignoring the report, or responding to Mr. Hickson, Mr. Bowler retaliated by contacting the private company complained about in the report in a series of communications highly critical of Mr. Hickson's fitness as an employee and security officer and calculated to result in the termination of his employment.

55.   Mr. Bowler implicitly threatened to damage Domtar's relationship with the Governor if Domtar did not retaliate against Mr. Hickson for writing a whistleblowing report which implicated Mr. Bowler.

56.   Less than an hour after he received Mr. Hickson's safety report, Mr. Bowler made a phone call to a representative of Domtar. During this phone call, Mr. Bowler elicited an apology for Mr. Hickson's report from Domtar representatives.

57.   After Domtar had apologized to Mr. Bowler on the phone, still less than an hour after receiving Mr. Hickson's report, Mr. Bowler sent an email to Domtar at 11:33 a.m. in which he wrote:

> Ken and Scot, could you please let me know how this situation shakes out. I simply wanted you folks to know about this in case you have a rouge Security person up there. Thanks Sgt. Bowler (Primary.Security@Maine.gov.)

11

58.   Mr. Bowler attached Mr. Hickson's email to his 11:33 a.m. email to

Domtar.

59.   At 12:18 p.m. Scott Beal of Domtar replied to Mr. Bowler in an email in

which he wrote:

> Sgt. Bowler- Once again, I feel compelled to apologize for
> this contractor's action. I will be dealing with this issue
> today along with one of my colleagues. I will be back to
> you on what we did to address this. Thank you for making
> me aware of this unfortunate event. Scott Beal

60.   At 12:34 p.m. Mr. Bowler replied in another email in which he wrote:

> Scott, thanks for getting back to me on this matter. Once
> again I simply wanted you folks to know you may have a
> problem employee on your hands or at least one that has
> limited common sense. The Governor did not see this e-
> mail and I don't see the need for him to view it unless
> circumstances beyond my control arise. I look forward to
> hearing from you again. Sgt. Bowler

61.   In response to Mr. Bowler's threatening communications, Domtar in turn

engaged in a series of communications with Vescom that were calculated to intimidate

Vescom into terminating Mr. Hickson's employment.

62.   Domtar, which had the option to terminate Vescom's contract without

cause, expressed to Vescom that its contract was in danger, that Domtar was very upset

that Mr. Hickson's report had been made, and that Domtar was concerned that the

report could damage its relationship with the Governor.

63.   At approximately 12:30 p.m. Mr. Beal called John Barker, Domtar's

human resources manager. Mr. Beal expressed concern about Mr. Hickson's

whistleblowing report and asked Mr. Barker to contact Vescom about the

whistleblowing report.

12

64.   After speaking with Mr. Beal, Mr. Barker called Matthew Cullen, Vescom's regional manager, and spoke with him about Mr. Hickson's whistleblowing report.

65.   Domtar typically addressed issues involving Vescom employees to Mr. Norman who was responsible for managing all Vescom employees at the Domtar mill.

66.   By taking the unusual step of bypassing Mr. Norman and contacting Mr. Cullen directly, Domtar indicated to Vescom that its contract was in jeopardy over Mr. Hickson's whistleblowing report.

67.   After Mr. Barker called Mr. Cullen, Mr. Cullen called Mr. Norman about Mr. Hickson's whistleblowing report.

68.   At approximately 1:30 p.m., Mr. Norman contacted Mr. Barker and received a copy of Mr. Hickson's whistleblowing email report.

69.   Mr. Norman has testified under oath that at the time Mr. Barker gave him a copy of the report, Mr. Barker expressed concern that Mr. Hickson's whistleblowing report "shouldn't have been done. It could hurt their relationship with the Governor or whoever and, uh, they were quite concerned with it."

70.   At around 1:45 p.m., approximately 15 minutes after Mr. Barker expressed to Vescom Domtar's concerns that Mr. Hickson should not have made his whistleblowing report and that the report could hurt Domtar's relationship with the Governor, Mr. Barker received a call from Mr. Norman informing him that Mr. Hickson had been suspended.

71.   At around 2:45 p.m., approximately one hour and fifteen minutes after Mr. Barker expressed to Vescom Domtar's concerns that Mr. Hickson should not have

13

made his whistleblowing report and that the report could hurt Domtar's relationship with the Governor, Mr. Barker received a call from Mr. Norman informing him that Mr. Hickson's employment had been terminated.

72.   When Mr. Hickson went into the Vescom office at around 2:30 p.m., Mr. Norman told Mr. Hickson to sit down because he wanted him to read something. Mr. Norman then handed Mr. Hickson a copy of the whistleblowing email report he had sent that morning to the Governor. Mr. Norman told Mr. Hickson that Domtar had received the email from the office of the Governor and sent it to Vescom.

73.   Mr. Norman told Mr. Hickson that Domtar had made it clear that Vescom was in danger of losing its contract if Mr. Hickson's employment was not terminated.

74.   Mr. Norman told Mr. Hickson that by bypassing Mr. Norman and directly contacting Mr. Cullen, Domtar had indicated to Vescom that its contract was in jeopardy over Mr. Hickson's whistleblowing report and that Vescom believed that its contract with Domtar would be jeopardized over the report if Mr. Hickson's employment was not terminated.

75.   Mr. Norman told Mr. Hickson that the reason for his termination was "at will employment."

76.   Mr. Norman told Mr. Hickson to wait 12 weeks before trying to collect unemployment. Mr. Norman told Mr. Hickson that if he tried to get unemployment before then or went public he would be sued.

77.   At 4:20 p.m. on July 25, 2006, Mr. Cullen called Mr. Barker. According to Mr. Barker's notes from that phone call, Mr. Cullen told Mr. Barker that "Mr. Hickson was terminated because he failed to follow the chain of command. Matt told me that he

14

should have brought his concern to Dave Norman, his immediate supervisor and that his actions could have been detrimental to Vescom or Domtar."

78.    On August 2, 2006 Vescom responded to a Request for Separation/Wage Information from the Maine Department of Labor Bureau of Unemployment Compensation. On the Request, Vescom gave as the reason for Mr. Hickson's termination: "Mr. Hickson violated Vescom's chain of command policy by discussing a matter directly with the client." This response was signed by a Vescom employee.

79.    Testifying under oath on September 18, 2006, Vescom Vice President Pamela Treadwell admitted that "[o]ne event was the final straw" which resulted in Mr. Hickson's discharge.

80.    Ms Treadwell also testified under oath on September 18, 2006 that "this event was, um, beyond the scope of what was acceptable."

81.    When asked under oath on September 18, 2006 about the "triggering event" that led to her decision to terminate Mr. Hickson, Ms. Treadwell offered as "the basis for that decision" a description of Mr. Hickson's report to the Governor and the events that led up to it.

82.    Mr. Hickson's supervisor, Mr. Norman, testified under oath on September 18, 2006 that Mr. Hickson had never received a disciplinary warning prior to his termination.

83.    Ms. Treadwell testified under oath on September 18, 2006 that she objected to the email because: "I believe I would take exception with the inference that [the Governor] disregarded safety. . . . The inference is that [Scott Beale] doesn't care about the safety of the Governor when he visits the mill."

15

84.    In a signed statement to the Maine Human Rights Commission, which was received by the Maine Human Rights Commission on April 2, 2007, Ms. Treadwell claimed that she fired Mr. Hickson because he "fit the profile" of a "delusional security officer."

85.    In the April 2, 2007 signed statement, Ms. Treadwell stated that Mr. Hickson's report "impl[ied] that our Client had thrown caution to the wind and exposed the group to danger."

86.    On January 30, 2007, Mr. Hickson's counsel sent a letter by certified mail to Vescom requesting a copy of Mr. Hickson's personnel file under 26 M.R.S.A. § 631. The letter contained a signed authorization from Mr. Hickson allowing his counsel to obtain these records.

87.    The letter was delivered to Vescom on February 1, 2007 at 10:26 a.m. The return receipt was signed by Ruth Brown.

88.    On May 18, 2007, Mr. Hickson's counsel sent a second letter to Vescom by certified mail and fax requesting a copy of Mr. Hickson's personnel file under 26 M.R.S.A. § 631. This letter also contained a signed authorization from Mr. Hickson allowing his counsel to obtain these records.

89.    The second letter was delivered to Vescom by fax at (207) 945-3835 on May 18, 2007 at 5:54 p.m. and by certified mail on May 21, 2007 at 10:59 a.m. The return receipt was again signed by Ruth Brown.

90.    Vescom never replied to the January 30, 2007 or May 18, 2007 requests under 26 M.R.S.A. § 631. Vescom to date has never provided Mr. Hickson with a copy of his personnel file.

91.    Defendant Bowler has acted with actual malice and with reckless disregard for Plaintiff's federally protected rights.

92.    Defendants Domtar and Vescom have acted with actual malice and with reckless disregard for Plaintiff's civil rights under the Whistleblowers' Protection Act and the Maine Human Rights Act.

93.    Defendant Domtar has acted with actual and implied malice when interfering with Plaintiff's employment with Vescom.

94.    On January 25, 2007, Mr. Hickson filed a charge of Whistleblowers' Protection Act retaliation in employment with the Maine Human Rights Commission ("MHRC") against the Defendants.

95.    On December 27, 2007, the MHRC issued notices of right to sue against Vescom and Domtar to Mr. Hickson under 5 M.R.S.A. § 4612(6) and § 4622(1)(C), authorizing him to pursue his case in court.

96.    Under 5 M.R.S.A. § 4622, Mr. Hickson has satisfied one or more of the prerequisites to be awarded attorney fees and all available damages under the Maine Human Rights Act and the Maine Whistleblowers' Protection Act.

### FIRST COUNT
### (CONSTITUTIONAL CLAIM)

97.    The allegations in paragraphs 1-96 are repeated.

98.    By virtue of the foregoing, Defendant David Bowler, while acting under color of state law, violated Plaintiff's constitutional right of free speech as guaranteed by the First Amendment to the Constitution of the United States of America, and Article I, Section 4 of the Maine Constitution. Mr. Hickson was unlawfully retaliated

17

against for writing to the Governor of the State of Maine about matters of public concern, including the safety of the Governor and hazardous practices at an industrial facility. As a result, he has suffered and is continuing to suffer professional and personal injuries, including lost wages and benefits, emotional pain and distress, suffering, inconvenience, mental anguish, loss of enjoyment of life, injury to reputation, injury to career, chilling of constitutional and free speech rights, deprivation of professional and career opportunities, and other pecuniary and non-pecuniary losses.

WHEREFORE, Plaintiff requests relief as follows:

a. Enter declaratory relief that defendants, while acting under color of state law, violated plaintiff's constitutional and statutory civil rights, including plaintiff's right to free speech;

b. Enter injunctive relief ordering Defendant Bowler to retract statements critical of Plaintiff and encourage Defendants Vescom and Domtar to reinstate Plaintiff to his original employment position; and to desist from all unlawful harassment and retaliation;

c. Award Plaintiff back pay for lost wages and benefits and prejudgment interest thereon and reinstatement, or, in lieu thereof, front pay for future lost wages and benefits;

d. Award compensatory and punitive damages in amounts to be determined at trial and prejudgment interest thereon;

e. Award Plaintiff his full costs, including reasonable attorney's fees and expert fees; and

f. Award such further relief as deemed appropriate.

## SECOND CLAIM

### (Intentional Interference with a Contractual Relationship)

99.   The allegations contained in paragraphs 1 - 98 are repeated.

100.  Defendant Domtar was aware that Plaintiff was an employee of Vescom Corporation.

101.  By virtue of the foregoing, Defendant Domtar has improperly, intentionally and maliciously interfered with Plaintiff's contract with Vescom and Plaintiff's prospective economic advantage as a continued employee of Vescom.

102.  Plaintiff has suffered damages as a result of Defendant Domtar's tortious conduct.

WHEREFORE, plaintiff requests relief as follows:

a.   preliminarily and permanently enjoin the Defendant Domtar from interfering with Plaintiff's employment.

b.   award compensatory damages in an amount that fully compensates the plaintiff for Defendant Domtar's tortious conduct;

c.   award punitive damages against the defendants;

d.   award plaintiff pre-judgment interest on said damages;

e.   award plaintiff his costs and reasonable attorney s fees; and

f.   award such further relief as is deemed appropriate.

## THIRD COUNT
## (WHISTLEBLOWING CLAIM)

103.  The allegations in paragraphs 1 – 102 are repeated.

104.  By virtue of the foregoing, Defendants Vescom and Domtar have terminated, intentionally discriminated, retaliated and aided and abetted retaliation against Plaintiff with respect to his compensation, terms, conditions and privileges of employment in violation of the Maine Whistleblowers' Protection Act, 5 M.R.S.A. §§ 831-840, and the Maine Human Rights Act, 5 M.R.S.A. §§ 4551-4634.

105.  As a direct and proximate result of Defendants' violation of Plaintiff's rights under the Maine Whistleblowers' Protection Act and the Maine Human Rights Act, Plaintiff has suffered damages, including lost wages and benefits, and is continuing to suffer professional and personal injuries, including lost wages and benefits, emotional pain and distress, suffering, inconvenience, mental anguish, loss of enjoyment of life, injury to reputation, injury to career, deprivation of professional and career opportunities, and other pecuniary and non-pecuniary losses.

WHEREFORE, Plaintiff requests relief as follows:

a.  Enter declaratory relief that Defendants have engaged in unlawful whistleblower retaliation against Plaintiff;

b.  Enter injunctive relief ordering Defendants to reinstate Plaintiff to his original employment position, and to desist from all unlawful harassment, retaliation or discrimination, and to provide effective training to all management employees, including Plaintiff's supervisors, on the laws prohibiting whistleblower retaliation in employment;

c.   Award Plaintiff back pay for lost wages and benefits and prejudgment interest thereon and reinstatement to employment, or, in lieu thereof, front pay for future lost wages and benefits;

d.   Award compensatory damages in amounts to be determined at trial by the jury and prejudgment interest thereon;

e.   Award Plaintiff his full costs, including reasonable attorney's fees and expert fees; and

f.   Award such further relief as deemed appropriate.

**FOURTH COUNT**
**(26 M.R.S.A. § 631 CLAIM)**

106.  The allegations in paragraphs 1-105 are repeated.

107.  By virtue of the foregoing, Defendant Vescom has unlawfully and without good cause failed for more than 530 days to provide Mr. Hickson with a copy of his personnel file in response to his written request, in violation of the 26 M.R.S.A. § 631, entitled "employee right to review personnel file."

WHEREFORE, Plaintiff requests relief as follows:

a.   Enter declaratory relief that Defendant Vescom has unlawfully and without good cause failed for more than 530 days to provide Mr. Hickson a copy of his personnel file in violation of 26 M.R.S.A. § 631;

b.   Enter injunctive relief ordering Defendant Vescom to provide Plaintiff a copy of his personnel file as defined in 26 M.R.S.A. § 631;

c.   Award Plaintiff the full statutory compensation available in the amount of $500;

21

d.   Award Plaintiff his full costs, including reasonable attorney's fees and

expert fees; and

e.   Award such further relief as deemed appropriate.


Dated:   July 25, 2008          /s/ David G. Webbert
                                David G. Webbert, Bar No. 7334
                                JOHNSON & WEBBERT, L.L.P.
                                160 Capitol Street, P.O. Box 79
                                Augusta, Maine   04332-0079
                                Tel: 207-623-5110
                                E-Mail: dwebbert@johnsonwebbert.com

                                Attorney for Plaintiff