UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| RICHARD HICKSON, )<br>)<br>Plaintiff )<br>)<br>v. )<br>)<br>DAVID BOWLER, et al., )<br>)<br>Defendants ) | Civil No. 08-255-B-W |

**RECOMMENDED DECISION ON MOTION TO DISMISS**

"Retaliation claims arise in any number of contexts. The essence of such a claim is that the plaintiff engaged in conduct protected by the Constitution or by statute, the defendant took an adverse action against the plaintiff, and this adverse action was taken (at least in part) because of the protected conduct." Thaddeus-X v. Blatter, 175 F.3d 378, 386 -87 (6th Cir. 1999) (en banc).

Richard Hickson is a former security officer for Hall Security. He worked for Vescom Corporation at the Domtar Industries Inc.'s Woodland Pulp and Paper Mill in Baileyville, Maine. In this civil action, Hickson brings claims against David Bowler, Vescom Corporation, and Domtar Industries Inc., seeking remedy for his firing, stemming from an email Hickson sent to the Maine Governor's Office through its web site. Hickson sent the email a couple of weeks after a July 8, 2006, visit to and tour of the mill by a group that included the Governor of Maine, a state representative, and the Governor's personal security guard, David Bowler, the movant. The email expressed Hickson's concern that members of the Governor's party did not sign-in as required, did not have the requisite safety footwear, and did not have back-up respirators. Hickson alleges that when Bowler, now a Lieutenant in the Maine State Police and the commander of the Maine State Police Special Investigations Unit, was forwarded this email he

contacted Domtar and exerted pressure on the company concerning Hickson, pressure that resulted in Hickson's firing the very day of these Bowler communications.

Bowler's motion to dismiss argues that he cannot be held liable for damages in his official capacity; that Hickson cannot obtain retrospective or prospective injunctive relief against him; that the sole count against him, Count I, should be dismissed because it fails to state a First Amendment claim; and that, if the court concludes that Hickson has stated a First Amendment claim against Bowler, Bowler is entitled to qualified immunity.  Having considered the arguments in the relevant pleadings (see Doc. Nos. 22, 26, 29, 30, 35 & 36) I recommend that the Court grant the motion with respect to any claim by Hickson that he is entitled to injunctive or declaratory relief apropos Bowler and I recommend that the court deny the motion to dismiss regarding the First Amendment claim and the assertion of qualified immunity.

## Discussion

With respect to this motion to dismiss, I "assume the truth of all well-pleaded facts in the complaint, drawing all reasonable inferences in the plaintiffs' favor." Fitzgerald v. Harris, 549 F.3d 46, 52 (1st Cir. 2008) (citing Federal Rule of Civil Procedure 12(b)(6) and Thomas v. Rhode Island, 542 F.3d 944, 948 (1st Cir.2008)). "To survive a motion to dismiss, the complaint must allege 'a plausible entitlement to relief.'" Id. (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007) and citing N.J. Carpenters Pension & Annuity Funds v. Biogen Idec Inc., 537 F.3d 35, 44 (1st Cir.2008)). Some of the issues raised by the parties "are ones of law, not of fact, and are amenable to resolution by a motion to dismiss the complaint." Id.

**A. Official Capacity Claims against Bowler and Request for Injunctive Relief**

In his response to the motion to dismiss Hickson indicates that he has sued Bowler in his official capacity "solely for prospective relief," relief "including retraction of defamatory allegations" (Resp. Mot. Dismiss at 2) and "encouragement of reinstatement" (id. at 10). He has amended his complaint, in part, to make this claim for relief crystal clear. (Id. at 2 n.1.) Hickson elaborates:

> Defendant Bowler remains a top official with the State Police, having been promoted since the events in question to the rank of a Lieut. An official retraction of his written adverse comments questioning Mr. Hickson's fitness to serve as a security officer would clear Mr. Hickson's employment record as a security officer of an ongoing stain on his reputation and improve his employment prospects. Similarly, because Defendant Bowler continues to hold a powerful position in the Maine Government, his official request to the other Defendants that Mr. Hickson be reinstated would improve Mr. Hickson's opportunity to be rehired.

(Resp. Mot. Dismiss at 10-11.) He also urges the court to consider its authority to order declaratory relief, which he describes as less intrusive than injunctive relief. (Id. at 11.) Hickson makes an argument that it is too premature to rule this entitlement to relief out vis-à-vis Defendant Bowler. (Id.)

"[W]here prospective relief is sought against individual state officers in federal forum based on a federal right, the Eleventh Amendment, in most cases, is not a bar." See Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261, 276-77 (1997); see also Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 73 (1996) ("[W]e often have found federal jurisdiction over a suit against a state official when that suit seeks only prospective injunctive relief in order to 'end a continuing violation of federal law.' ") (quoting Green v. Mansour, 474 U.S. 65, 68 (1985)).

Clearly, Hickson cannot argue that the court needs to enjoin Bowler from "a continuing violation of federal law." Seminole Tribe of Fla., 517 U.S. at 73. This was a one-time action as it

3

pertains to Hickson. There is no allegation that Bowler in any way continues to retaliate against Hickson for the email. This court would never fashion the type of injunctive relief envisioned by Hickson requiring Bowler to exert pressure on private entities that may or may not be in a position to re-hire Hickson and that would not be required to heed Bowler's input after being sued by Hickson for allegedly doing that very thing.[1] The cases that Bowler cites in support of this claim all involve prospective relief of returning a terminated worker to the state's payroll and/or expunging state records regarding adverse employment actions and improper disciplinary sanctions. Those cases involve the state's continuing violation of federal law by maintaining the improper records or continuing to bar the plaintiff from employment. The relief is prospective.

---

[1] In his corrected objection to the Bowler pleadings, Hickson maintains:
> Defendant Bowler misstates Plaintiff's claims against him for injunctive and declaratory relief. For example, Defendant Bowler omits any discussion of the request for relief in both Hickson's original complaint and his first amended complaint that Defendant Bowler encourage Defendants Vescom and Domtar to reinstate Plaintiff to his original employment position. Complaint at ¶ 98(b); First Amended Complaint at ¶ 98(b). The Court can take judicial notice of the plausibility of the inference that the Governor holds considerable sway with Domtar because of the Governor's ability to directly or indirectly provide financial and other support to Domtar. See, e.g., Carol Coultas and Whit Richardson, *Domtar to close pulp mill, layoff 330*, Mainebiz (March 5, 2009) (on-line version) ("Gov. John Baldacci said this morning he had dispatched Rosaire Pelletier, a paper industry expert, to work with Domtar on trying to find a way to keep the mill opened"). Plus, it is far from futile for Mr. Hickson to seek relief to require the Governor's former personal bodyguard, who has since been promoted within state government, to "issue written notices to the other defendants to correct and retract his statements critical of plaintiff" and to encourage plaintiff's reinstatement. It is likely that Plaintiff will remain ineligible for rehire by the two defendant employers so long as Defendant Bowler's negative e-mails about Plaintiff remain in their files. Courts have routinely upheld orders of reinstatement as appropriate injunctive relief in Ex Parte Young cases against state employees in their official capacity. See, e.g., Elliot v. Hinds, 786 F.2d 298, 302 (7th Cir. 1986)(reversing district court dismissal of prayer for injunctive relief because "[t]he injunctive relief requested here, reinstatement and expungement of personnel records, is clearly prospective in effect and thus falls outside the prohibitions of the *Eleventh Amendment*.")(emphasis in original); see also Coakley v. W. Don Welch, 877 F.2d 304, 306 (4th Cir. 1989)(district court correct to permit plaintiff to pursue injunctive remedy of reinstatement.); Russell v. Dunston, 896 F.2d 664, 668 (2nd Cir. 1990)("[R]einstatement to medical leave would be prospective relief and not barred by the *Eleventh Amendment*" because the Court did "not agree with the district court that the existence of a past harm renders an otherwise forward-looking injunction retroactive.").

(Pl.'s Corrected Obj. at 6-7, Doc. No. 35.)

In this case the proposed injunctive relief is entirely remedial, an attempt to "unring the bell." The official capacity claim fails to meet the Ex Parte Young standard for prospective injunctive relief against a state official.

**B.    Statement of First Amendment Claim[2]**

The alleged facts most material to the First Amendment retaliation claim against Bowler are as follows.[3]

On the morning of July 25, 2006, Mr. Hickson visited the official Internet website of the State of Maine on his personal home computer while he was at his home and off duty from work. (Am. Compl. ¶44.) Mr. Hickson clicked on a photograph of the Governor of Maine and was taken to the Governor's home page. He then clicked on a link that said, 'Contact Me.' He was taken to a page that read, "I want to hear from you. Whether you have an issue involving state government, want to share your thoughts, or offer feedback on this site, please take the time to use one of the following methods to contact me." (Id. ¶ 45.) Mr. Hickson was still very concerned about the safety problems with the July 8, 2006, tour of the mill. Although he had reported his concerns to his supervisor, no action had been taken to prevent similar safety issues from repeating themselves. He was concerned that the Governor might tour the mill or another similar mill again in the future and that the Governor's safety or that of others might be endangered again and that OSHA regulations would be violated. He was also concerned that other visitors to the mill might have their safety endangered in the future. (Id. ¶ 46.) Because of

---

[2]    Hickson's amended complaint includes in Count I an invocation of his right to petition government. There is not enough clarity in his argument or in the case law essayed here to warrant discussing this as a claim distinct from a First Amendment retaliation claim. He has not attempted to distinguish this aspect of his single claim in his corrected objection to Bowler's motion to dismiss.

[3]    In setting forth these facts I recognize that there is a bit of hyperbole in the articulation of the 'facts' in the repeated characterization of the email as "whistleblowing."

his concerns about safety hazards and OSHA violations, and because his employer had taken no action to correct the problem or allay his concerns after he reported his concerns to his supervisor, Mr. Hickson wrote an email to the Governor reporting his safety concerns in response to the invitation on the Governor's website. (Id. ¶ 47.)

Mr. Hickson sent his email whistleblowing report at 10:35 a.m. on July 25, 2006. (Id. ¶ 48.) In his email to the Governor, Mr. Hickson outlined his concerns about the July 8, 2006, tour of the mill. Mr. Hickson wrote in part:

> None of your entourage signed the entry log at the Main Gate and your group wore inadequate safety gear. The entry log is not just a requirement of Domtar but, is also an OSHA requirement. In case of an emergency the entry logs are the only way of determining who may be in the mill and in what area to search. As far as safety equipment your dress shoes were not protection enough against the corrosive elements in the mill. The woman in your group was wearing open toe shoes with bare skin showing and your protective detail wore dress shoes that were not safety shoes. I didn't notice any respirators on your group either. . . .I am rather tough on safety and this is just a reminder for you in case you should happen to tour the mill on another occasion.

(Id. ¶ 49.) Mr. Hickson explicitly stated in his email that he was writing in his personal capacity and not as an employee of Vescom: "Please note that this is coming from my personal email. . . . [T]he email to you was a decision on my part alone therefore no one else should be held accountable for what I had to say."  (Id. ¶ 50.)  Mr. Hickson never received a response from the Office of the Governor. (Id. ¶ 51.)

At 10:40 a.m. on July 25, 2006, a staffer at the Office of the Governor forwarded Mr. Hickson's email to then Sgt. David Bowler of the Maine State Police. (Id. ¶ 52.) Mr. Bowler was delegated final authority for handling Mr. Hickson's report by the Office of the Governor. (Id. ¶ 53.) Instead of investigating the validity of the report, ignoring the report, or responding to Mr. Hickson, Mr. Bowler retaliated by contacting the private company complained about in the

report in a series of communications highly critical of Mr. Hickson's fitness as an employee and security officer and calculated to result in the termination of his employment. (Id. ¶ 54.) Mr. Bowler implicitly threatened to damage Domtar's relationship with the Governor if Domtar did not retaliate against Mr. Hickson for writing a whistleblowing report which implicated Mr. Bowler. (Id. ¶ 55.)

Less than an hour after he received Mr. Hickson's safety report, Mr. Bowler made a phone call to a representative of Domtar. During this phone call, Mr. Bowler elicited an apology for Mr. Hickson's report from Domtar representatives. (Id. ¶ 56.) After Domtar had apologized to Mr. Bowler on the phone, still less than an hour after receiving Mr. Hickson's report, Mr. Bowler sent an email to Domtar at 11:33 a.m. in which he wrote: "Ken and Scot, could you please let me know how this situation shakes out. I simply wanted you folks to know about this in case you have a rouge Security person up there. Thanks Sgt. Bowler (Id. ¶ 57.) Mr. Bowler attached Mr. Hickson's email to his 11:33 a.m. email to Domtar. (Id. ¶ 58.)

At 12:18 p.m. Scott Beal of Domtar replied to Mr. Bowler in an email in which he wrote: ["]Sgt. Bowler- Once again, I feel compelled to apologize for this contractor's action. I will be dealing with this issue today along with one of my colleagues. I will be back to you on what we did to address this. Thank you for making me aware of this unfortunate event. Scott Beal.["] (Id. ¶ 59.) At 12:34 p.m. Mr. Bowler replied in another email in which he wrote:

> Scott, thanks for getting back to me on this matter. Once again I simply wanted you folks to know you may have a problem employee on your hands or at least one that has limited common sense. The Governor did not see this email and I don't see the need for him to view it unless circumstances beyond my control arise. I look forward to hearing from you again. Sgt. Bowler[.]

(Id. ¶ 60.)

In response to Mr. Bowler's threatening communications, Domtar in turn engaged in a series of communications with Vescom that were calculated to intimidate Vescom into terminating Mr. Hickson's employment. (Id. ¶ 61.) Domtar, which had the option to terminate Vescom's contract without cause, expressed to Vescom that its contract was in danger, that Domtar was very upset that Mr. Hickson's report had been made, and that Domtar was concerned that the report could damage its relationship with the Governor. (Id. ¶ 62.) At approximately 12:30 p.m. Mr. Beal called John Barker, Domtar's human resources manager. Mr. Beal expressed concern about Mr. Hickson's whistleblowing report and asked Mr. Barker to contact Vescom about the whistleblowing report. (Id. ¶ 63.) After speaking with Mr. Beal, Mr. Barker called Matthew Cullen, Vescom's regional manager, and spoke with him about Mr. Hickson's whistleblowing report. (Id. ¶ 64.) Domtar typically addressed issues involving Vescom employees to Mr. Norman who was responsible for managing all Vescom employees at the Domtar mill. (Id. ¶ 65.) By taking the unusual step of bypassing Mr. Norman and contacting Mr. Cullen directly, Domtar indicated to Vescom that its contract was in jeopardy over Mr. Hickson's whistleblowing report. (Id. ¶ 66.) After Mr. Barker called Mr. Cullen, Mr. Cullen called Mr. Norman about Mr. Hickson's whistleblowing report. (Id. ¶ 67.) At approximately 1:30 p.m., Mr. Norman contacted Mr. Barker and received a copy of Mr. Hickson's whistleblowing email report. (Id. ¶ 68.) Mr. Norman has testified under oath that at the time Mr. Barker gave him a copy of the report, Mr. Barker expressed concern that Mr. Hickson's whistleblowing report "shouldn't have been done. It could hurt their relationship with the Governor or whoever and, uh, they were quite concerned with it." (Id. ¶ 69.) At around 1:45 p.m., approximately 15 minutes after Mr. Barker expressed to Vescom Domtar's concerns that Mr. Hickson should not have made his whistleblowing report and that the report could hurt

Domtar's relationship with the Governor, Mr. Barker received a call from Mr. Norman informing him that Mr. Hickson had been suspended. (Id. ¶ 70.)

At around 2:45 p.m., approximately one hour and fifteen minutes after Mr. Barker expressed to Vescom Domtar's concerns that Mr. Hickson should not have made his whistleblowing report and that the report could hurt Domtar's relationship with the Governor, Mr. Barker received a call from Mr. Norman informing him that Mr. Hickson's employment had been terminated. (Id. ¶ 71.)  When Mr. Hickson went into the Vescom office at around 2:30 p.m., Mr. Norman told Mr. Hickson to sit down because he wanted him to read something. Mr. Norman then handed Mr. Hickson a copy of the whistleblowing email report he had sent that morning to the Governor. Mr. Norman told Mr. Hickson that Domtar had received the email from the office of the Governor and sent it to Vescom.  (Id. ¶ 72.) Mr. Norman told Mr. Hickson that Domtar had made it clear that Vescom was in danger of losing its contract if Mr. Hickson's employment was not terminated.  (Id. ¶ 73.)  Mr. Norman told Mr. Hickson that by bypassing Mr. Norman and directly contacting Mr. Cullen, Domtar had indicated to Vescom that its contract was in jeopardy over Mr. Hickson's whistleblowing report and that Vescom believed that its contract with Domtar would be jeopardized over the report if Mr. Hickson's employment was not terminated. (Id. ¶ 74.) Mr. Norman told Mr. Hickson that the reason for his termination was "at will employment." (Id. ¶ 75.)

In his response to the motion to dismiss, Hickson points out that it is undisputed that Bowler undertook all the alleged actions in his capacity as an employee of the State of Maine. (Resp. Mot. Dismiss at 3, 11.)  I agree with Hickson that Bowler's argument that the complaint does not allege sufficient state action to hold him liable is "implausible." (Id. at 12.)  Indeed,

Bowler agrees that he was a state actor in his first reply memorandum for purposes of this motion only.  (1st Reply Mem. at 4.)

Hickson also insists that the First Amendment prohibition on retaliation for the exercise of a First Amendment right to petition government is not limited to cases of direct termination but includes "lesser adverse actions" impacting a citizen's employment and reputation.  (Id. at 3, 13-14.) In his first reply memorandum Bowler persists in insisting that the termination decision was made by a private actor.  (1st Reply Mem. at 4.)  It is Bowler's contention that the emails would have had to contain a threat to be considered sufficiently threatening or coercive. (Id.)

Hickson maintains that because he is not a public employee the Pickering v. Board of Education, 391 U.S. 563, 568, 574 (1968) balancing test is inapplicable.  (Id. at 3; Pl.'s Corrected Obj. at 4-5.)  The First Circuit has concluded that the mixed motive standards for employment discrimination cases apply to First Amendment claims brought by an arrestee against a police officer.  Tatro v. Kervin, 41 F.3d 9, 18 (1st Cir. 1994).  There is logic to this approach because the relationship between the arrestee or employee plaintiff and the officer or employer defendant vis-à-vis alternative bases for the alleged wrongful action is parallel.   See also Mendocino Environmental Ctr.  v. Mendocino County,192 F.3d 1283, 1300 & n 32 (9th Cir. 1999).  Because Hickson's First Amendment retaliation claim against Bowler requires him to establish that his protected speech was the motivating factor in Bowler's conduct, presumably the analogy could apply to this situation as well.

In his first reply memorandum, Bowler back peddles from his argument that adverse employment action cases control; he instead cites to the Sixth Circuit's en banc Thaddeus-X v. Blatter which summarized:

> A retaliation claim essentially entails three elements: (1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two-that is, the adverse action was motivated at least in part by the plaintiff's protected conduct.

175 F.3d 378, 394 (6th Cir. 1999) (en banc) (citing Bloch v. Ribar, 156 F.3d 673, 678 (6th Cir.1998); Lewis v. ACB Bus. Servs., Inc., 135 F.3d 389, 406 (6th Cir.1998), Penny v. United Parcel Serv., 128 F.3d 408, 417 (6th Cir.1997), and Yellow Freight Sys., Inc. v. Reich, 27 F.3d 1133, 1138 (6th Cir.1994)). "This formulation," the Court explained, "describes retaliation claims in general, but it will yield variations in different contexts." Id.  The Seventh Circuit recently thoroughly addressed First Amendment retaliation claims and highlighted the potential distinctions of import depending on the role of the speaker and the state-actor responder. Bridges v. Gilbert, __ F.3d __. __, 2009 WL 529573 (7th Cir. Mar. 4, 2009).[4] See also Buck v. City of Albuquerque, 549 F.3d 1269, 1292 (10th Cir. 2008) ("We examine First Amendment retaliation claims under Worrell v. Henry, 219 F.3d 1197 (10th Cir.2000). Our Worrell inquiry revolves around the evidence supporting (1) that plaintiffs were engaged in constitutionally protected activity; (2) whether defendants caused the plaintiffs to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) whether defendants' actions were motivated by plaintiffs' protected activity. Id. at 1212."); Bennett v. Hendrix, 423 F.3d 1247, 1253-54 (11th Cir. 2005)(following Thaddeus-X in non-prisoner case); Eichenlaub v. Township of Indiana, 385 F.3d 274, 284 (3d Cir. 2004) ("The rationale for a

---

[4] It invoked the following standard: "To prevail on a First Amendment retaliation claim, [a plaintiff] must ultimately show that (1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was 'at least a motivating factor' in the Defendants' decision to take the retaliatory action." Id. at 3  (quoting Woodruff v. Mason, 542 F.3d 545, 551 (7th Cir.2008), quoting Massey v. Johnson, 457 F.3d 711, 716 (7th Cir.2006)).

public/private concern distinction that applies to public employees simply does not apply to citizens outside the employment context. By the same token, the decisions of the Supreme Court and of our court have not established a public concern threshold to the protection of citizen private speech. We decline to fashion one now. '[C]onstitutional review of government employment decisions must rest on different principles that review of speech restraints imposed by the government as sovereign.'")(quoting Waters v.Churchill 511 U.S. 661, 674 (1994)); Keenan v. Tejeda, 290 F.3d 252, 259 -60 (5th Cir. 2002)(" The settled law of other circuits, which we endorse, holds that to establish a First Amendment retaliation claim against an ordinary citizen, Keenan and Przybylski must show that (1) they were engaged in constitutionally protected activity, (2) the defendants' actions caused them to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) the defendants' adverse actions were substantially motivated against the plaintiffs' exercise of constitutionally protected conduct."); Horstkotte v. N.H. Dept. of Corrections, Civil No. 08-cv-285-JL, 2009 WL 369489, 3 -4 (D.N.H. Feb. 10, 2009) (citing Thaddeus-X in a prisoner case).

  With regards to the protected conduct aspect of the inquiry, the email was sent as a concerned citizen through an internet portal that is clearly intended to encourage the input of Maine citizens in the everyday concerns of the State of Maine. What is more, there is no dispute that Hickson disclaimed in his email that he was sending this missive on behalf of his employer. The fact that Hickson had firsthand experience of the safety issues addressed in the email as a private security employee posted to the Baileyville Mill in a situation that required him to respond to a visit from a state government group does not transform this into a 'public employee' First Amendment claim.

12

Apropos the behavior attributed to Bowler in the allegations of the complaint and the adverse action taken, it is not a reach to say that the prospect of a government official's pressure on an employer vis-à-vis a private company's employee would deter that employee from exercising his or her First Amendment right to petition. See Tierney v. Vahle, 304 F.3d 734, 740-41 (7th Cir. 2002) ("The distinction between reputation and other interests, some of constitutional stature, that defamation may injure is evident in the cases that hold that although defamation is not a constitutional tort when all it does is injure the plaintiff's reputation, it becomes one when it deprives the plaintiff of his liberty of occupation, an interest protected by the due process clauses as reputation itself is not."); see also Sullivan v. Carrick, 888 F.2d 1, 4 (1st Cir.1989) (observing that an actual professional disciplinary hearing – as opposed to a threatened one –"might at least present itself as evidence of a possible violation. But no hearing was ever held. To hold that a violation of constitutional rights occurred, under the circumstances stated, would be to trivialize the First Amendment.")[5]; see also cf. Greene v. McElroy, 360 U.S. 474, 492-93 (1959); B. C. Morton Intern. Corp. v. Federal Deposit Ins. Corp., 305 F.2d 692, 698-699 & n.6 (1st Cir. 1962). Drawing reasonable inferences in favor of Hickson, Bowler's email pressure on an employer about the conduct of an employee – without even knowing what was said in the phone calls – would be sufficient under the notice pleading requirements. The risk of losing a job is no small matter; indeed, it stands out as a severe repercussion in comparison to other negative impacts that could hypothetically flow from a citizen's decision to email the Governor from a web site expressly inviting such comments and input.[6] I reject Bowler's

---

[5] See Bennett v. Hendrix, 423 F.3d 1247, 1251 n.4 (11th Cir. 2005).
[6] Even applying the First Circuit's Rivera-Jimenez v. Pierluisi, 362 F.3d 87, 94 (1st Cir. 2004) standard applicable to employment cases, these email-dependent allegations seem sufficient to get Hickson by this motion to dismiss. See id. at 94-95 ("Here, the plaintiffs have alleged sufficiently adverse employment actions to sustain their

arguments that he cannot be held liable for First Amendment retaliation because he was not able to terminate Hickson himself.[7]

As alleged, Bowler would not have, could not have sent the emails or made a phone call about Hickson had not Hickson submitted his comment to the Governor's email comment line. In that respect the allegations of the complaint meet the "causal connection" third prong of the Thaddeus-X test and even the "but-for" test. See Tatro, 41 F.3d at 18; see also Kilpatrick v. King, 499 F.3d 759, 768 (8th Cir. 2007) ("Adverse action that cannot be defended by any non-retaliatory explanation provides a basis for a reasonable jury to find that the defendants acted with improper motives.")(applying 'substantial factor' test); Mattox v. City of Forest Park, 183 F.3d 515, 520-21(6th Cir.1999) ("[T]he issue is whether the adverse action taken against plaintiffs by defendants was motivated in substantial part by the protected activity of the plaintiffs[.]").  This is all, of course, crediting the allegations of the complaint which the court must do apropos a motion to dismiss.

As Hickson summarizes in his corrected objection, a response to the motion to dismiss the amended complaint:

---

retaliation claims. Plaintiff Rivera claims that she was subjected to, among other things, internal investigation and ultimately dismissal as a result of engaging in protected speech. Plaintiff Maldonado claims that he was subjected to, among other things, the denial of special benefits and assignments. Assuming these allegations are true, Suboh [v. Dist. Attorney's Office of Suffolk County], 298 F.3d [81,] 90 [(1st Cir.2002)], and absent more information minimizing the impact of the denial of benefits, plaintiffs have alleged sufficiently adverse employment actions to underpin a claim of impermissible retaliation.").

And, as Hickson points out, the Supreme Court's Burlington Northern and Santa Fe Railroad Company v. White, 548 U.S. 53, 57 (2006) concluded that Title VII's anti-retaliation provision "does not confine the actions and harms it forbids to those that are related to employment or occur at the workplace"; "covers those (and only those) employer actions that would have been materially adverse to a reasonable employee or job applicant"; and  "that the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination."

[7]     I also do not find helpful Hickson's arguments citing cases concerning state and private actors sued for conspiring to violate a plaintiff's constitutional rights.  (See Pl.'s Corrected Obj. at 9-10.) Hickson has not sued Domtar or Vescom under Count I and he is not trying to prove that these private entities conspired to retaliate against Hickson for exercising his First Amendment rights.  Domtar and Vescom are sued on state law claims only.

>       The unusually dramatic timing evidence in this case, is (1) at 10:40 a.m. on July 25, 2006, Mr. Hickson sent the whistleblower e-mail to the Governor; (2) less than an hour later Mr. Bowler made a phone call to a representative at Domtar and elicited an apology; (3) at 11:33 a.m. Mr. Bowler sent an e-mail to Domtar defaming Mr. Hickson as a "rogue Security person" and requesting a follow-up report concerning "how the situation shakes out"; (4) at 12:18 p.m. a senior official for Domtar sent an e-mail to Mr. Bowler stating that he felt "compelled to apologize" again; (5) at 12:34 p.m. Mr. Bowler sent another e-mail to Domtar this time defaming Mr. Hickson as "a problem employee" and "at least one who has limited common sense" and again reminding Domtar that he wanted to hear back how Mr. Hickson was dealt with; (6) at 2:30 p.m. Mr. Hickson was shown this e-mail to the Governor and fired. First Amended Complaint ¶¶ 44-75.

(Pl.'s Corrected Obj. at 2.)

In his second reply memorandum Bowler argues:

>       With regard to the issue of adverse action, Hickson also argues that Defendant Bowler has spun the facts in the light most favorable to Defendant Bowler. That is not the case. Hickson has alleged that Bowler's communications were "calculated to result in the termination of [Hickson's] employment;" "implicitly threatened to damage Domtar's relationship with the Governor if Domtar did not retaliate against Mr. Hickson for writing a whistleblowing report which implicated Mr. Bowler;" and "elicited an apology for Mr. Hickson's report from Domtar representatives." *Amended Complaint, ¶¶ 54-56.*
>       There is no need for conclusory characterizations of the e-mails. The e-mails sent by Defendant Bowler to Domtar are before the Court. The only missing piece is what was said during the telephone conversation between Bowler and Domtar. Hickson has alleged only that Bowler elicited an apology from Domtar. Hickson has not cited any case that holds "eliciting" an apology constitutes adverse action. Hickson argues that he should be permitted to take discovery on what was said during the telephone conversation, prior to a dismissal of the claims. Defendant Bowler disagrees. In order to proceed with his claim, Hickson is obliged to set forth in his complaint sufficient factual allegations to support his claim. While there is no heightened pleading in civil rights cases, the basic notice pleading requirements of the Civil Rules still requires that the complaint "set forth minimal facts as to who did what to whom, when, where, and why." <u>Pagan v. Calderon</u>, 448 F.3d 16, 31(1st Cir. 2006). Hickson has failed to allege sufficient adverse action taken by Defendant Bowler to allow his claim to proceed.

(2d Reply at 4-5.) Given the timing of Bowler's emails, the phone call, and his insistence that he wished to be kept abreast of the actions taken regarding Hickson, these pled facts are not simply

15

"bare allegations" of the retaliatory motive necessary to sustain this claim. See Crawford-El v. Britton, 523 U.S. 574, 588-89 (1998).[8]

In his second reply memorandum Bowler claims: "Hickson appears to concede that his termination cannot be attributed to Defendant Bowler. Accordingly, that portion of his claim that relates to the termination, *i.e.,* his claims for lost wages, front pay and benefits should be dismissed." (2d Reply Mem. at 3.) It is an interesting offensive effort but should Hickson ultimately succeed on his First Amendment claim against Bowler the damages may well include calculations of the impact on Hickson's employment flowing from the retaliatory act. It is true that Bowler did not directly terminate Hickson's employment; that decision was not made by a state actor and in that sense was not "state action." Nevertheless it would be premature at this juncture to attempt to limit Hickson's damages claim by attempting to enter a partial summary judgment on some portion of that claim.

### C. Qualified Immunity

"Qualified immunity is a judge-made construct that broadly protects public officials from the threat of litigation arising out of their performance of discretionary functions." Bergeron v. Cabral, __ F.3d __, __, 2009 WL 580795, 2 (1st Cir. Mar. 9, 2009) (citing Pagán v. Calderón, 448 F.3d 16, 31 (1st Cir.2006)). "The defense is available to public officials whose 'conduct does

---

[8] Bowler makes an argument that his alleged retaliatory comments deserve First Amendment protection of their own. Bowler does not explain how this would be so given the fact that Hickson's letter on its face was a simple statement of his opinion of a group's noncompliance with safety procedures. It is perplexing how Bowler – a safety official himself – could see this letter as a sign of a 'rogue' security officer. What is more, Hickson's only speech was made to company representatives and he even disclaimed an intent of letting the Governor know, let alone the public. In his second reply memorandum addressing qualified immunity Bowler insists: "It is appropriate for this Court to take into account the general security issues that a reasonable official in Defendant Bowler's position would have considered upon receipt of Hickson's e-mail." (2d Reply Mem. at 7.) This statement does little to explain what security issues were raised by Hickson's e-mail about the need to comply with the mill's safety policies.

not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Id. (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).

With regards to Bowler's assertion that he is entitled to qualified immunity, I have already concluded that Hickson has stated a First Amendment claim. As to the remainder of the qualified immunity analysis, Hickson again stresses that the public employee cases relied on by Bowler are inapplicable to his claims and that it was clearly established that "the Government cannot punish private citizens for exercising their First Amendment rights, including their rights of free speech and to petition Government." (Resp. Mot. Dismiss at 4.) Hickson cites to McDonald v. Smith, which stated:

> The First Amendment guarantees "the right of the people ... to petition the Government for a redress of grievances." The right to petition is cut from the same cloth as the other guarantees of that Amendment, and is an assurance of a particular freedom of expression. In United States v. Cruikshank, 2 Otto 542, 92 U.S. 542 (1876), the Court declared that this right is implicit in "[t]he very idea of government, republican in form." Id., at 552. And James Madison made clear in the congressional debate on the proposed amendment that people "may communicate their will" through direct petitions to the legislature and government officials. 1 Annals of Cong. 738 (1789).
> The historical roots of the Petition Clause long antedate the Constitution. In 1689, the Bill of Rights exacted of William and Mary stated: "[I]t is the Right of the Subjects to petition the King." 1 Wm. & Mary, Sess. 2, ch. 2. This idea reappeared in the Colonies when the Stamp Act Congress of 1765 included a right to petition the King and Parliament in its Declaration of Rights and Grievances. See 1 B. Schwartz, The Bill of Rights-A Documentary History 198 (1971). And the Declarations of Rights enacted by many state conventions contained a right to petition for redress of grievances. See, e.g., Pennsylvania Declaration of Rights (1776).

472 U.S. 479, 482-83 (1985) (addressing an action in which an individual who wrote a letter to various executive branch officials was being sued for libel by a third party and the letter writer was asserting immunity). This is weighty heritage for the right to petition.

There is the added layer to the right asserted by Hickson -- a citizen cannot be retaliated against for exercising this right by a state official. Ten years ago Thaddeus-X v. Blatter summarized:

> It is well established that government actions, which standing alone do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for exercise of a constitutional right. See, e.g., Crawford-El v. Britton, 523 U.S. 574 (misdirection of personal belongings may state a claim of retaliation for exercise of First Amendment rights); Board of County Comm'rs, Wabaunsee County v. Umbehr, 518 U.S. 668, (1996) (nonrenewal of plaintiff's government contract in retaliation for his exercise of free speech is actionable); Perry v. Sindermann, 408 U.S. 593, 597 (1972) ("[I]f the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited.").

175 F.3d 378, 386 (6th Cir. 1999); see also Buck, 549 F.3d at 1292 Kilpatrick, 499 F.3d at 767; Soranno's Gasco, Inc. v. Morgan, 874 F.2d 1310, 1314 (9th Cir. 1989).

This is perhaps a general statement of the right, see Mihos v. Swift, 358 F.3d 91,109 (1st Cir. 2004) ("The level of abstractness at which the 'right' in question is articulated can often determine the outcome of this inquiry. In consequence, the Supreme Court has cautioned against applying general definitions of constitutional rights in the qualified immunity context. Anderson v. Creighton, 483 U.S. 635, 639 (1987)."), but the novelty of the facts of case, either in terms of the plaintiff's speech or the defendant's reaction, does not in and of itself negate notice, see Hope v. Pelzer 536 U.S. 730, 741 (2002) ("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances."); accord Jennings v. Jones, 499 F.3d 2, 16 - 17 (1st Cir. 2007). And, in this case the First Amendment principle does not have to be tailored to the context of the speech, such as is the case with public employment cases. See, e.g., Eng v. Cooley, 552 F.3d 1062, 1075 -76 & n.6 (9th Cir. 2009).

The next question is could a reasonable state official in Bowler's position think that it was okay under the First Amendment to pressure Hickson's employer to take action against him because of a nonthreatening email concerning the need for visitors to comply with OSHA and mill safety protocol?  This is not a subjective test.  See Crawford-El, 523 U.S. at 588-89.  The fact that Bowler might have thought he was acting within the constitution in exerting pressure so see that Hickson was "dealt with" for the email he sent to the Governor's comment site does not prove the point; a reasonable official in his position would have recognized the First Amendment protection afforded Hickson's email. See  Jordan v. Carter, 428 F.3d 67, 71 -76 (1st Cir. 2005) ("We cannot award immunity to appellant on the basis that a reasonable officer would not have realized the impropriety of his conduct."); see also M.M.R.-Z. ex rel. Ramirez-Senda v. Puerto Rico, 528 F.3d 9, 13 -14 (1st Cir. 2008) ("Here, defendants do not dispute that under clearly established law, retaliation could give rise to a first amendment claim remediable under section 1983; the only apparent basis for the denial [of defendants' summary judgment motion] seems to be the court's perception of a factual dispute, namely, whether there was enough evidence of a retaliatory motive to survive summary judgment."); Mihos, 358 F.3d at 106 ("With its careful attention to the ways in which trial courts can control the examination of an official's state of mind pre-trial, the Supreme Court acknowledged in Crawford-El that the adoption of an objective standard for qualified immunity in Harlow did not foreclose all state of mind inquiries during the pre-trial consideration of qualified immunity when state of mind is an element of the constitutional tort.").  Bowler may indeed revisit the issue of the sufficiency of the evidence regarding retaliatory motive as the case progresses, but for purposes of the motion to dismiss, Hickson has pled sufficient facts to state a sustainable claim in face of Bowler's assertion of qualified immunity.

## Conclusion

For these reasons I recommend that the court grant the motion to dismiss as to Hickson's claim against Bowler in his official capacity, having concluded that Hickson has not defended an entitlement to prospective injunctive or declaratory relief. I recommend that the court deny the motion as to Hickson's First Amendment claim against Bowler in his individual capacity and deny Bowler's motion to the extent he seeks dismissal of that claim on the basis of qualified immunity.

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within ten (10) days of being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

March 17, 2009